JS6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2005 | **DATE** | 9/26/2002 |
| **CASE TITLE** | Linda Rodriguez vs. Jo Anne B. Barnhart, Commissioner of Social Security | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Enter Memorandum Opinion and Order: This matter is reversed and remanded to the ALJ for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | 3 |
| | No notices required. | | number of notices |
| ✓ | Notices mailed by judge's staff. | | SEP 2 7 2002 |
| | Notified counsel by telephone. | | date docketed |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials |
| | Copy to judge/magistrate judge. | | |
| | courtroom deputy's initials | U.S. DISTRICT COURT | date mailed notice |
| | | 02 SEP 26 PM 3:31 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number

**25**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

SEP 2 7 2002

| | | |
|---|---|---|
| LINDA RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 C 2005 |
| | ) | |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Nan R. Nolan |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Linda Rodriguez's claim for Disability Insurance Benefits and Supplemental Security Income. The Administrative Law Judge ("ALJ") held that Ms. Rodriguez was not disabled because she could perform her past relevant work as a telemarketer and, alternatively, that she could perform a significant number of jobs in the national economy. Ms. Rodriguez argues that the ALJ made several legal and factual errors and that the ALJ's decision is not supported by substantial evidence. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, this matter is REMANDED to the ALJ for further proceedings consistent with this opinion.

### Background

The Social Security Administration denied the plaintiff's application for benefits both initially and upon reconsideration. Ms. Rodriguez then sought a hearing before an ALJ. ALJ

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Jo Anne B. Barnhart is automatically substituted as defendant in this case.



Barbara J. Welsch held a hearing on June 8, 1998, during which the plaintiff and a vocational expert testified. Also before the ALJ were medical reports and treatment notes from doctors who had examined Ms. Rodriguez.

Medical Evidence

The plaintiff injured her back while at work in December 1986. (R. 161.) Dr. Eugene Bartucci, an orthopedic surgeon, diagnosed Ms. Rodriguez as having a herniated disc and performed a laminectomy in December 1987. (R. 178, 180.) Ms. Rodriguez improved after the surgery. (*Id.*) Other than occasional discomfort she did not experience any significant problems until June 1993, when she bent over and her back stiffened up. (R. 176.) She soon developed a pain in her left leg. (*Id.*) Ms. Rodriguez went to the emergency room but the doctors did not treat her because she was pregnant. (*Id.*) That same month, Ms. Rodriguez went to see Dr. Bartucci who made a preliminary diagnosis of radiculopathy[2] and sent her to Elmhurst Memorial Hospital to be fitted for a TENS[3] unit. (*Id.*)

Ms. Rodriguez saw Dr. Bartucci five times between July 1993 and March 1997. In July 1994—approximately thirteen months after the June 1993 visit—Ms. Rodriguez returned to see Dr. Bartucci and complained that she was still experiencing pain in her back and left leg. (*Id.*) Dr. Bartucci ruled out radiculopathy and recommended that Ms. Rodriguez submit to a Magnetic Resonance Imaging ("MRI") scan of her lumbar spine. (*Id.*) Nine months later, in April 1995, Dr.

---

[2] Radiculopathy is a disease of the nerve roots. Richard Sloane, *The Sloandorland Annotated Medical Legal Dictionary 601* (1987).

[3] A TENS unit, which stands for Transcutaneous Electrical Nerve Stimulation, is a device that "uses low current at low-frequency oscillation for pain relief. . . . Depending on the severity of pain, 20 min. to a few hours of stimulation may be applied several times daily." Mark H. Beers & Robert Berkow eds., *The Merck Manual of Diagnosis and Therapy*, 2495 (17th ed. 1999).

Bartucci saw the plaintiff again. (*Id.*) She stated that her left leg was still bothering her and that she had not obtained a MRI scan since her last visit because there is no MRI scanner near her home. (*Id.*) Dr. Bartucci prescribed pain medication and decided to admit the plaintiff to a hospital for a MRI scan and a subsequent diagnosis. (*Id.*)

Ms. Rodriguez was admitted to Elmhurst Memorial Hospital for pain management from May 1 to May 3, 1995. (R. 156.) On May 2, Dr. Bartucci examined the plaintiff and noted that she had an abnormal gait, a slight decrease in dorsiflexion in her left foot that was consistent with L4-5 motor weakness and straight leg raising of her left leg at forty-five degrees. (R. 151.) The doctor's report also notes that Ms. Rodriguez's pain had been previously treated with physical therapy and pain medication but that her pain had recently become uncontrollable by those remedies. (*Id.*) Dr. Bartucci diagnosed the plaintiff as having failed back syndrome with recurrent left leg radiculopathy and administered an epidural steroid injection. (*Id.*) Also in May 1995, Dr. Gerald B. Holtz performed a MRI scan of Ms. Rodriguez's spine. (R. 155.) Dr. Holtz's report states that the scan revealed some degeneration of the L5-S1 disc and a small bulging disc in the same area. (*Id.*) Dr. Holtz, opining that the bulging disc may be nothing more than scar tissue, concluded that there was no evidence of focal disc herniation or a recurrent disc. (*Id.*)

Approximately one year later, on April 4, 1996, Dr. Bartucci examined Ms. Rodriguez again. (R. 156.) Ms. Rodriguez complained that her condition had not improved and stated that her back "sometimes feels like it is going out on me." (*Id.*) Dr. Bartucci's report notes positive straight leg raising with some weakness in the ankle and concludes that Ms. Rodriguez "will continue on Disability and I will see her as needed." (*Id.*) The plaintiff did not return to see Dr. Bartucci until March 26, 1997. (*Id.*) At that time, she reported that she continued to have problems with her lower

back and left leg. (*Id.*) During the March 1997 visit, Dr. Bartucci noted "some spasm in the [left] foot . . . [p]ositive straight-leg-raising and decreased or absent S1 reflex." (*Id.*) The doctor prescribed pain medication and recommended that the plaintiff stay off work and undergo a second MRI exam. (*Id.*)

In April 1997, Dr. David W. Lando performed a second MRI scan of the plaintiff's spine. (R. 196.) Dr. Lando's report notes the presence of a mass in the same area as the plaintiff's previous laminectomy and states that the mass is compatible with disc reprolapse[4] on the left side of Ms. Rodriguez's spine. (*Id.*) Dr. Lando's report concludes that "[t]here is no evidence of disc herniation at any of the other levels and no other abnormalities are noted." (*Id.*)

On both April 14 and April 24, 1997, Dr. Bartucci noted recurrent disk herniation at L4-5 and opined that it is mostly scar tissue. (R. 156.) Due to the large amount of scar tissue, Dr. Bartucci advised Ms. Rodriguez that the risks involved with a second surgery would be quite high. (*Id.*) Dr. Bartucci recommended therapy and pain medication. (*Id.*) Ms. Rodriguez visited Dr. Bartucci six times over the next thirteen months. (R. 194.) She continued to complain of pain in her back and left leg. (*Id.*) On two occasions during this period, Dr. Bartucci noted a popping sound in the plaintiff's left hip and opined that she might have an inherent left hip problem. (*Id.*) Dr. Bartucci prescribed various pain medications during these visits. (*Id.*) On June 2, 1998, Dr. Bartucci wrote a letter summarizing his care of Ms. Rodriguez. (R. 195.) The entire body of the letter states as follows:

---

[4] *Stedman's Medical Dictionary* defines "prolapse" as "[t]o sink down, said of an organ or other part." *Stedman's Medical Dictionary* 1146 (5th ed. 1982).

Linda Rodriguez has underwent lumbar laminectomy in December of 1987. She has developed recurrent herniated disk and, at this point, she has severe left leg pain and weakness. At this point, she is considered to have severe low back syndrome and will require additional surgical procedure. I consider her completely disabled at this time.

(*Id.*)

After the plaintiff filed her DIB and SSI application in March 1997, the Social Security Administration arranged for two residual functional capacity ("RFC") assessments and one internal medicine consultative examination of the plaintiff. The first RFC assessment—completed by Dr. F. Paul LaFata in May 1997—states that the plaintiff can (1) lift twenty pounds occasionally and ten pounds frequently,[5] (2) stand and/or walk at least two hours in an eight-hour workday, (3) sit about six hours in an eight-hour workday, and (4) push and/or pull without limitation. (R. 166.) The assessment also notes that the plaintiff can frequently balance, kneel and crawl and that she can occasionally climb, stoop, and crouch. (R. 167.) Finally, Dr. LaFata's assessment concludes that his findings were not significantly different from Dr. Bartucci's conclusions regarding the plaintiff's limitations. (R. 171.)

A consultative physician, Dr. Richard Kammenzind, examined the plaintiff at the request of the Social Security Administration in July 1997. (R. 161.) He reviewed Dr. Bartucci's medical reports and the April 1997 MRI report. (R. 162). Ms. Rodriguez told Dr. Kammenzind that she could stand for between ten and fifteen minutes, that she could walk for up to one-half of a block, and that she could sit without limitation. (*Id.*) She also stated that she could not carry over ten pounds or drive very much, and that she occasionally needed her daughter's help to get dressed. (*Id.*)

---

[5] According to the RFC form, "frequently" means a cumulative total of between one-third and two-thirds of an eight-hour workday, and "occasionally" means a cumulative total of between "very little" and one-third of an eight-hour workday. (R. 165.)

Dr. Kammenzind's report notes that the plaintiff had a normal gait, did not use a cane, could get on and off the exam table with minimal assistance, and could dress and undress herself in private, in about five minutes, including taking her socks and shoes off and putting them back on. (R. 163.) After acknowledging the plaintiff's previous history of a herniated disc, Dr. Kammenzind's report concludes that he did not detect any evidence of nerve root compression. (*Id.*) The report specifically notes that a "straight leg raising [exercise] elicited some complaint of discomfort at ninety degrees but [that Ms. Rodriguez] could easily get her leg up that high." (*Id.*) Dr. Kammenzind opined that an x-ray of Ms. Rodriguez's spine showed the following: (1) an unbalanced anomaly at the lumbosacral junction; (2) retrolisthesis of L4 on L5 in extension; and (3) moderate degenerative disc disease at L4-L5. (R. 164.)

Dr. George R. Andrews performed the second RFC in March 1998. (R. 184-191, 192.) Dr. Andrews indicated that his RFC assessment was based on the prior denial notices dated May 30 and August 26, 1997, Dr. Bartucci's medical record through October 1, 1997, Dr. Kammenzind's June 1997 report, and the first RFC. (R. 189.) Dr. Andrews concluded that Ms. Rodriguez can (1) occasionally lift fifty pounds and frequently lift twenty-five pounds, (2) stand and/or walk for about six hours in an eight-hour workday, (3) sit for about six hours in an eight-hour workday, and (4) push and pull without limitation. (R. 185.) The second RFC assessment notes that the plaintiff can frequently climb, balance, kneel and crawl and that she can occasionally stoop and crouch. (R. 186.) Dr. Andrews opined that the plaintiff's subjective complaints were excessive when compared to the medical evidence; he specifically noted that the plaintiff could perform a straight leg raise to ninety degrees, there was no evidence of nerve root compression, the plaintiff made no unscheduled visits to her doctor or the emergency room with reports of severe pain, the plaintiff performed medium-

level work for seven years despite her alleged pain, and there is no evidence that the plaintiff pursued therapy despite multiple suggestions that she do so. (R. 189.)

Ms. Rodriguez's Testimony

On the date of the hearing before the ALJ, Ms. Rodriguez was thirty years old. (R. 210.) She completed the tenth grade. (R. 211.) Before May 1993, she had worked in a variety of jobs, including injection molding machine operator, housekeeper, telemarketer, and fast-food worker. (R. 108, 143-45, 212-13.) She has not worked since May 1993. (R. 108, 144-145.)

Ms. Rodriguez testified that during a typical day she gets up at 6:00 a.m. and wakes up her fourteen-year-old daughter for school. (R. 214.) Her other daughter, age nine, wakes up a few hours later. (R. 215.) At around 9:00 a.m., Ms. Rodriguez's husband stops by, makes breakfast, and takes care of the youngest daughter. (*Id.*) Her brother or sister-in-law visit at noon to check up on her and her daughter. (*Id.*) Ms. Rodriguez's husband comes home after work and prepares dinner and the eldest daughter comes home from school and cleans. (*Id.*) The plaintiff testified that she does not do any household chores but that she usually bathes and dresses herself and occasionally goes grocery shopping. (R. 215, 218.) She also stated that she attends GED classes twice a week and that sometimes she drives herself to those classes. (R. 216.)

Ms. Rodriguez testified that she cannot work due to pain in her back and left leg. (R. 214.) She stated that she experiences a burning, stinging pain in her back on a daily basis. (R. 219.) She also complained of numbness, weakness and a shooting pain in her left leg and stated that her hip "pops" and that occasionally her left leg would give out on her. (R. 214.) Ms. Rodriguez testified that she can walk approximately one-half of a block at time, sit for twenty to thirty minutes, stand for fifteen minutes, lift up to ten pounds and climb up and down stairs. (R. 221.) She stated that she

cannot bend over and pick up objects off the floor. (R. 222.) Ms. Rodriguez also testified that laying down relieves pressure on her spine and that she lies down for most of the day to alleviate the pain in her back. (R. 222-23.)

Vocational Expert's Testimony

At the hearing, the ALJ asked a vocational expert to consider a hypothetical individual who was thirty years old, had a tenth grade education, had performed the same past relevant work as Ms. Rodriguez, and had the ability to do light work with the following limitations: no repetitive stooping or bending, no climbing or working at unprotected heights, and no repetitive leg or foot controls on the left. (R. 224.) The ALJ asked the expert whether such an individual could perform any of her past relevant work. (*Id.*) The vocational expert testified that such an individual would be able to work as a telemarketer. (*Id.*) The expert further testified that such an individual could perform the following unskilled entry-level jobs that were currently available in the Chicago metropolitan area: cashier (3200 jobs), security attendant (2000 jobs), office clerk (3600 jobs), ticket seller (1600 jobs), charge account clerk (800 jobs), inspector (900 jobs), telephone quotation clerk (500 jobs), and telemarketer (3600 jobs). (R. 224-25.) The vocational expert also testified that if the same hypothetical individual required a position in which she could switch between sitting and standing, then that individual could still perform the duties of a charge account clerk, telemarketer, security attendant or ticket seller. (R. 225.)

At the hearing, Ms. Rodriguez's attorney attempted to ask the vocational expert whether the plaintiff's one month of experience as a telemarketer should be considered past relevant work. The ALJ disallowed the question. The following exchange occurred:

-8-

Q: An my – – and just a final question which is not on, on the hypothetical. Did she – – that one month that she performed the telemarketing job, was that vocationally relevant in her case?

A: That, that's usually up to the Judge to – –

ALJ: I –

A: – – to decide.

Q: And if – –

A: It's up to her to decide whether it's relevant or not. We don't usually make that judgment.

Q: Well, can I, can I ask you your opinion?

ALJ: No

(R. 226.)

## ALJ's Decision

The ALJ applied the familiar five-step analysis set out in 20 C.F.R. § 416.920. Pursuant to that regulation, the ALJ was required to address each of the following questions in sequential order: (1) Is Ms. Rodriguez presently employed? (2) Is her impairment or combination of impairments severe? (3) Do her impairments meet or exceed any of the specific impairments listed in the appendix to the regulations? (4) Have Ms. Rodriguez's impairments limited her remaining or "residual" functional capacity to the point that he or she is no longer able to perform the demands and duties of a former occupation? (5) Is the claimant unable to perform any other work in the national economy given her age, education and work experience? 20 C.F.R. § 416.920(a)-(f).

At step one, the ALJ concluded that the plaintiff had not engaged in "substantial gainful activity" since the onset date of her alleged disability. Regarding steps two and three, the ALJ held

that Ms. Rodriguez had a "severe" impairment, but that her impairment did not met or equal the severity of any impairment listed in the appendix to the regulations. At steps four and five, the ALJ concluded that the plaintiff could return to her past relevant work as a telemarketer and that she could perform a significant number of jobs in the national economy. In reaching this decision, the ALJ determined that the plaintiff retained the ability to perform light work with the following restrictions: the plaintiff can lift and/or carry a maximum of twenty pounds and frequently lift and/or carry up to ten pounds, but she cannot climb, work at unprotected heights or perform repetitive stooping, bending or tasks involving leg/foot controls on the left. The ALJ explained that these limitations were different than the state agency physicians' RFC evaluations because the ALJ had considered new and material evidence. Accordingly, the ALJ determined that Ms. Rodriguez was not disabled.

## Discussion

The plaintiff argues that the ALJ erred when she (1) discounted the plaintiff's testimony regarding her pain and inability to work; (2) commented on the plaintiff's failure to pursue regular medical treatment; (3) failed to assign controlling weight to Dr. Bartucci's June 1998 report; (4) failed to include all of Ms. Rodriguez's symptoms in the hypothetical questions posed to the vocational expert; and (5) prohibited the plaintiff's attorney from posing a specific question to the vocational expert. The Court will address each of these arguments.

### 1. Whether the ALJ Improperly Discounted the Plaintiff's Testimony

In this case, both the treating physician and the examining physicians agreed that the plaintiff's alleged pain was supported by her recurrent disk herniation at L4-5, (R. 155, 166, 189), and the ALJ found that the plaintiff had a medically determined impairment of recurrent disk

herniation at L4-5 with left radiculopathy, (R. 22). Once a plaintiff establishes that she suffers from a medically determinable physical impairment that could reasonably be expected to produce the pain alleged, the ALJ must evaluate the intensity or persistence of the plaintiff's pain. In order to determine the severity of the pain, the ALJ must "examine and weigh all the evidence including observations by treating and examining physicians, the claimant's testimony and daily activities, functional restrictions, pain medication taken, and aggravating or precipitating factors to evaluate how much the claimant's impairment affects h[er] ability to work." *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994) (citing 20 C.F.R. § 404.1529 & Social Security Ruling 88-13). The ALJ cannot ignore the claimant's allegations where the medical signs and findings reasonably support her complaint of pain. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ cannot dismiss the plaintiff's complaints of pain without explaining her conclusion "in a manner sufficient to permit an informed review." *Herron*, 19 F.3d at 334 (internal quotation and citation omitted).

Here, the ALJ found that the plaintiff's "alleged pain and functional limitation were not fully credible as they were not supported by the medical evidence or relevant credibility factors." (R. 22.) There are several problems with the ALJ's credibility determination. Specifically, the Court concludes that the ALJ made impermissible independent medical determinations and ignored or failed to explain evidence favorable to the plaintiff.

A. ALJ's Improper Medical Determinations

Ms. Rodriguez testified that she experiences debilitating pain on a daily basis. The ALJ discounted the plaintiff's complaints of pain based in part on her observation that "[Ms. Rodriguez] does not exhibit the usual signs of severe, unremitting pain such as abnormal weight loss, muscle atrophy or difficulty concentrating." (R. 20.) Ms. Rodriguez argues that there is no evidence in the

record supporting the ALJ's conclusion that persons with severe, unremitting pain usually have such symptoms. The defendant did not respond to this argument. The Court's own review of the record did not reveal any evidence supporting the ALJ's statement.

The court in *Yousif v. Chater*, 901 F. Supp. 1377 (N.D. Ill. 1995), addressed the exact same argument currently advanced by Ms. Rodriguez. In that case, the ALJ inferred that the plaintiff was not in pain because there was no evidence of the usual signs of severe pain such as abnormal weight loss, muscle atrophy or problems sleeping or concentrating. *Id.* at 1385. After noting that the record contained no evidence that the pain described by the plaintiff usually resulted in such manifestations, the *Yousif* court held that the ALJ erred when he "create[d] the premise that a person who *really* felt the degree of pain of which Yousif complained should have shown signs of abnormal weight loss, muscle atrophy or problems sleeping or concentrating, and then [drew] a negative inference when [he] did not find those manifestations." *Id.* (emphasis in original). This case is no different. The record contains no evidence that the pain described by Ms. Rodriguez is usually accompanied by the "usual signs of severe pain" enumerated in the ALJ's decision. Accordingly, the Court concludes that the ALJ erred when she discounted the plaintiff's complaints of pain based in part on the absence of such manifestations. *Johns v. Bowen*, 821 F.2d 551, 557 (11th Cir. 1987) (per curiam) (holding that the ALJ erred when he "developed his own indicia for measuring claimant's pain, including drawn features, weight loss and muscle atrophy").

The ALJ also made other improper medical determinations. For example, the ALJ concluded that the plaintiff's testimony regarding "problems with walking, sleeping and regular activities" and her alleged inability to "sit, stand, bend, squat or kneel for prolonged periods" was unsupported by the medical evidence. (R. 19.) In support of this conclusion, the ALJ noted that (i) although Ms.

-12-

Rodriguez had positive straight leg raising, her deep tendon reflexes were normal on both sides, and (ii) even though she complained of left leg pain, the plaintiff had intact strength in her left leg. (R. 19.) The ALJ discredited Ms. Rodriguez's complaints of back and leg pain based on evidence indicating that her deep tendon reflexes were normal and that her leg strength was intact. However, the record contains no evidence indicating a negative relationships between back and/or leg pain and normal deep tendon reflexes or intact leg strength. Because the ALJ did not rely on any medical authority in the record, the Court concludes that the ALJ erred when she determined that normal deep tendon reflexes and intact leg strength contradicted the plaintiff's complaints of pain. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating that ALJ must not make her own medical findings); *see also Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982) (noting that ALJs should avoid commenting on the meaning of tests when there has been no supporting expert testimony).

B. Favorable Evidence Ignored or Not Explained by the ALJ

The ALJ may not select and discuss only that evidence that favors her ultimate conclusion. *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000); *see also Herron*, 19 F.3d at 333 (holding that meaningful review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence). In discrediting the plaintiff's testimony, the ALJ also ignored and failed to explain evidence that supported the plaintiff's complaints of pain. For example, the ALJ commented that the plaintiff failed to reschedule a MRI scan without explaining that the plaintiff could not receive a MRI exam in the area in which she lived. An ALJ cannot discount a plaintiff's complaints of pain based on a failure to seek medical treatment without at least discussing the reasons given by the plaintiff for not seeking such treatment. *Khan v. Chater*, No. 96 C 2872, 1997 WL 669764, at *3 (N.D. Ill. Oct. 22, 1997) (holding that it was improper for ALJ to conclude that plaintiff not in pain

based on failure to have surgery because ALJ failed to address plaintiff's testimony that he was afraid that a surgery would leave him paralyzed); *Yousif*, 901 F. Supp. at 1384 (holding that it was improper for ALJ to conclude that plaintiff not in pain based on failure to seek treatment because ALJ did not address evidence establishing that treatment exacerbated the plaintiff's condition). In this case, because the ALJ failed to address the stated reason for the plaintiff's failure to obtain a MRI exam, the Court concludes that it was improper for the ALJ to infer that the plaintiff's failure to reschedule the MRI exam indicated that she was not in pain.

The ALJ also failed to discuss the significance of the medical evidence supporting the plaintiff's complaints of pain. The medical evidence establishes that the plaintiff exhibited symptoms of significant positive straight leg raising, muscle spasms, decreased dorsiflexion, weakness in her ankle, decreased or absent S1 reflex, a "popping" sound in her hip, and a limited range of motion of her back. Although the ALJ's decision mentions some of these symptoms, it does not explain why these symptoms do not compel a finding that the plaintiff's complaints of pain are credible. Instead of discussing this evidence, the ALJ relied heavily on the July 1997 consultative examination performed by Dr. Kammenzind that concluded that the plaintiff had a normal gait, could easily lift her left leg to ninety degrees and that there was no evidence that she suffered from nerve root compression. (R. 20.) However, the ALJ failed to explain inconsistencies between these Dr. Kammenzind's conclusions and other medical evidence in the record. For example, Dr. Bartucci's May 1995 physical examination found that the plaintiff was unable to demonstrate her gait, that her straight leg raise was positive at forty-five degrees, and that she suffers from failed back syndrome with recurrent left leg radiculopathy. (R. 151.) The ALJ's decision also acknowledges that the plaintiff suffers from radiculopathy. (R. 22.) The ALJ does not explain how Dr. Kammenzind's

conclusion that the plaintiff does not suffer from nerve root compression is consistent with the ALJ's own conclusion that the plaintiff suffers from radiculopathy—a disease of the nerve roots. (*supra* at 2 n.2.) Nor does the ALJ explain why she credited Dr. Kammenzind's conclusion that the plaintiff had a normal gait over Dr. Bartucci's determination that she was unable to demonstrate a normal gait.

Similarly, the ALJ's decision states that Ms. Rodriguez has not had any physical therapy for her back injury since 1993. However, Dr. Bartucci's May 1995 report indicates that the plaintiff did have physical therapy after 1993; that report states that "in December of 1993 [the plaintiff] began to develop increasing low back pain with a recurrent left radicular component. This pain was previously treated with physical therapy and oral medications. *Recently* her pain has become uncontrollable by these therapies." (R. 151 (emphasis added).) The ALJ's decision does not discuss this report.

Additionally, the ALJ's decision states that the plaintiff's daily activities indicate that she has the capacity to work. The ALJ did not explain how she reached this conclusion. The fact that Ms. Rodriguez could attend a one-hour class twice a week, read school information, watch TV, take care of her own personal hygiene needs, and occasionally make sandwiches or go grocery shopping does not establish that she was capable of engaging in substantial physical activity. *See Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000) (ruling that minimal daily activities, such as two-hour household chores every day, cooking simple meals, going grocery shopping about three times a month, playing cards about twice a month, are not substantial evidence that claimant does not suffer disabling pain); *Noyd v. Barnhart,* No. 01 C 15, 2002 WL 1559708, at *19 (N.D. Ill. July 12, 2002) (reasoning that plaintiff's ability to perform minor activities of daily living does not demonstrate that plaintiff can

perform substantial work activity). Furthermore, the Court notes that the ALJ mischaracterized the plaintiff's testimony regarding her daily activities. For example, Ms. Rodriguez testified that she has not visited her brother in more than six months. (R. 217.) However, the ALJ's decision states that the plaintiff testified that she visits her brother *every* six months. (R. 21.) Similarly, Ms. Rodriguez testified that she wakes her eldest daughter up and that "[the daughter] gets dressed and situated and off to school." But the ALJ's decision contemplates a more active role for the plaintiff—the decision states that Ms. Rodriguez's daily activities include "getting her daughter off to school." (R. 21.)

The Court also concludes that the ALJ did not sufficiently explain her reason for discrediting the plaintiff's testimony regarding her inability to work. Ms. Rodriguez testified that she cannot work due to the pain in her back and leg. Specifically, she stated that she can walk approximately one-half of a block at time, sit for twenty to thirty minutes, stand for fifteen minutes, lift up to ten pounds and climb up and down stairs. (R. 221.) She also stated that she could not bend over and pick up an object from the floor and that she needed to lie down almost all day to relieve the pain in her back. (R. 221-222.) The ALJ discounted this testimony based in part on her determination of the plaintiff's residual functional capacity. (R. 21.) The ALJ stated that her RFC determination "is slightly different from that which was determined by the State Agency and is based on new and material evidence." (*Id.*) However the ALJ's decision does not identify and explain the "new and material" evidence that factored into her RFC determination. It is the ALJ's responsibility to "build an accurate and logical bridge from the evidence to [her] conclusions." *Zurawski*, 245 F.3d at 887. At a minimum, the ALJ must identify and explain the evidence supporting an adverse credibility determination. Social Security Ruling 96-7p; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002);

*Zurawski*, 245 F.3d at 887. In this case, the ALJ erred when she failed to identify the "new and material" evidence that contributed to her decision to discount the plaintiff's testimony.

Courts have noted that whether benefits are warranted in severe pain cases depends largely on the ALJ's assessment of the plaintiff's credibility. *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989); *Villarreal v. Sec'y of Health and Human Serv.*, 818 F.2d 461, 463 (6th Cir. 1987) (per curiam). Although the ALJ offered some legitimate reasons for discounting the plaintiff's testimony regarding her pain and inability to work, the Court cannot determine how much weight the ALJ attributed to the absence of the "usual signs of severe, unremitting pain" or to the residual functional capacity determination that was based on unidentified "new and material evidence." Additionally, the ALJ ignored or failed to explain evidence that supported the plaintiff's complaints of pain. Accordingly, the Court cannot be sure that absent these errors the ALJ would have reached the same conclusions regarding the plaintiff's testimony. Because Ms. Rodriguez's testimony about her pain and inability to work is central to her claim for benefits, the Court concludes that this matter must be remanded to the ALJ. To facilitate matters on remand, the Court will address the plaintiff's remaining arguments.

## 2. Whether the ALJ Improperly Commented on the Plaintiff's Failure to Pursue Regular Medical Treatment

In her decision, the ALJ commented that "[t]he claimant did not begin to pursue regular medical treatment until March 1997." (R. 20.) The plaintiff argues that this comment was improper for two reasons. First, Ms. Rodriguez contends that the ALJ's statement is factually incorrect. The Court disagrees. Although it is undisputed that the plaintiff sought medical treatment before March 1997, the issue is whether the ALJ erred when she concluded that the plaintiff did not seek *regular*

medical treatment prior to that date. The plaintiff visited Dr. Bartucci only six times between June 1993 and March 1997. In contrast, she visited the doctor eight times between April 1997 and May 1998. The Court concludes that the ALJ did not err in reasoning that six doctor visits within a forty-five month period does not constitute *regular* medical treatment, especially when compared to the plaintiff's much more frequent visits during the subsequent thirteen month period.

Ms. Rodriguez next argues that the ALJ improperly concluded that she was not disabled because she did not pursue regular medical treatment. The plaintiff's argument is premised on her assumption that the ALJ applied 20 C.F.R. § 404.1530—a regulation which states that a claimant is not entitled to benefits if, without good reason, she refused to follow treatment prescribed by her physician and that treatment could have restored her ability to work. 20 C.F.R. § 404.1530; SSR 82-59. After reviewing the ALJ's decision, the Court concludes that the ALJ did not apply § 404.1530. The ALJ's decision does not mention § 404.1530, and, most importantly, the comments at issue concern the plaintiff's failure to seek regular medical treatment, as opposed to a failure to follow prescribed medical treatment. The ALJ apparently commented on the plaintiff's infrequent doctor visits as one of the reasons for discrediting the plaintiff's complaints of pain. In evaluating a plaintiff's complaints of pain and limitations, an ALJ is permitted to consider "[the] treatment, other than medication, that the plaintiff receives. . . ." 20 C.F.R. § 404.1529(c)(3)(v). Courts have noted that a claimant's failure to seek medical treatment may undercut allegations of severe and incapacitating pain. *Luna*, 22 F.3d at 691 (holding that ALJ properly concluded that plaintiff's pain not severe enough to warrant benefits based in part on plaintiff's failure to seek medical assistance despite claim of incapacitating pain); *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995) (reasoning that failure to seek medical treatment for a year during a claimed period of disability tends to indicate

tolerable pain); *Phillips v. Massanari*, No. 00 C 3939, 2001 WL 936120, at *9 (N.D. Ill. Aug. 16, 2001) (concluding that ALJ could reasonably infer that the plaintiff's complaints of disabling pain were exaggerated because he had been able to tolerate the pain without medical intervention for some time). Accordingly, the Court concludes that the ALJ did not err when she commented on the plaintiff's failure to pursue regular medical treatment.

### 3. Whether the ALJ Should Have Assigned Controlling Weight to Dr. Bartucci's June 1998 Report

In his June 1998 report, Dr. Bartucci concluded that the plaintiff requires surgery and that she was completely disabled at that time. The ALJ discredited these conclusions as inconsistent with Dr. Bartucci's own treatment notes and unsupported by the other medical evidence. (R. 20.) The plaintiff argues that the ALJ should have given controlling weight to Dr. Bartucci's June 1998 report. The defendant contends that Dr. Bartucci's opinion regarding the plaintiff's condition in 1998 is irrelevant because the doctor formed that opinion years after the plaintiff was last insured for disability benefits. The Court agrees that Dr. Bartucci's June 1998 opinion of the plaintiff's condition is irrelevant.

Ms. Rodriguez's status as an insured expired on December 31, 1995. In order to recover benefits, she must establish that she was disabled as of that date. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997); *Brown v. Massanari*, 167 F. Supp. 2d 1015, 1017 (N.D. Ill. 2001). Dr. Bartucci's June 1998 report opines that the plaintiff was disabled at that time. The Court concludes that Dr. Bartucci's opinion whether the plaintiff was disabled in June 1998 is irrelevant to whether she was disabled as of December 31, 1995. Even if the Court were to determine that Dr. Bartucci's June 1998 opinion was relevant, the Court would still conclude that the ALJ did not err when she did not assign controlling weight to that opinion. A doctor's opinion that a claimant is disabled is

-19-

not entitled to controlling weight because the ultimate determination of disability is reserved to the Commissioner. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); Social Security Ruling 96-5p (stating that "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance").

4. Whether the Hypothetical Question Posed to the Vocational Expert Included All of Ms. Rodriguez's Impairments

The parties agree that hypothetical question(s) posed by the ALJ to a vocational expert must fully set for the claimant's impairments to the extent that they are supported by the medical evidence in the record. *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993). The plaintiff argues that the ALJ's hypothetical question in this case erroneously omitted most of her impairments. Whether the plaintiff's argument is correct depends on the ALJ's credibility determinations. Because the ALJ disbelieved Ms. Rodriguez's complaints of pain and her alleged limitations regarding walking, sitting, and standing, the ALJ did not included those alleged restrictions in her hypothetical questions to the vocational expert. As noted previously, however, the ALJ's decision to discredit the plaintiff's subjective complaints of pain was based on several omissions and mischaracterizations of significant evidence. Therefore, on remand, the Commissioner must reevaluate the evidence regarding the plaintiff's subjective complaints of pain and inability to work in determining her residual functional capacity. If on remand the Commissioner credits the plaintiff's testimony or determines that any additional restrictions are supported by the medical evidence, such limitations must be considered in evaluating whether Ms. Rodriguez is able to perform either her prior work as a telemarketer or a significant number of jobs in the national economy.

### 5. Whether the ALJ Erred When She Prohibited the Plaintiff's Attorney from Posing a Specific Question to the Vocational Expert

At the hearing, the plaintiff's attorney asked the vocational expert whether her prior telemarketing job was vocationally relevant. The expert responded that the ALJ must decide whether a certain job qualifies as past relevant work. The ALJ then told the attorney that he could not ask the expert's opinion on the matter. The plaintiff argues that the ALJ's decision to prohibit her attorney from soliciting the expert's opinion deprived her of her right of cross examination. The defendant argues that the vocational expert's opinion about the plaintiff's prior telemarketing position is irrelevant because the ALJ determines whether a claimant's past work experience is vocationally relevant. The Court disagrees. The issue is not whether the ALJ or the vocational expert has the responsibility of deciding whether past work is vocationally relevant. It is clear that the ALJ makes this decision. The issue is whether a vocational expert's opinion can be relevant to that determination. The Court concludes that the vocational expert, if he had been given a chance, may have been able to provide relevant testimony on this topic.

According to 20 C.F.R. § 404.1565, prior work experience is considered vocationally relevant if the job (i) occurred in the last fifteen years; (ii) lasted long enough for the claimant to learn how to do it; and (iii) and qualifies as substantial gainful activity. *Martin v. Sullivan*, 901 F.2d 650, 652 (8th Cir. 1990). Social Security Ruling 82-62 explains that to qualify as past relevant work, a prior job must have been of a sufficient duration "for the worker to have learned the techniques, acquired information, and developed the facility needed for average performance in the job situation. The length of time this would take depends on the nature and complexity of the work." Social Security Ruling 82-62. At the hearing, the plaintiff's attorney asked the vocational expert whether the

plaintiff's one month of experience as a telemarketer was vocationally relevant. It is possible that the expert would have testified that a telemarketing position requires more than one month to learn the job. Such testimony would clearly be relevant to the ALJ's determination of whether the plaintiff's prior telemarketing job constitutes past relevant work. Accordingly, because it is possible that the vocational expert may have been able to provide relevant testimony on this topic, the Court concludes that the ALJ erred when she prohibited the plaintiff's attorney from cross-examining the expert.

## Conclusion

For the foregoing reasons, this matter is REVERSED and REMANDED to the ALJ for further proceedings consistent with this opinion.

**ENTER:**

*Nan R. Nolan*

**Nan R. Nolan**

**United States Magistrate Judge**

Dated: Sept 26, 2002